DECISION.
{¶ 1} Defendant-appellant Jesse Darryl Gandy shot Terry Douglas three times at close range. Following a jury trial, Gandy was convicted of attempted murder, two counts of felonious assault, and accompanying gun specifications.[1] Gandy received an aggregate sentence of 29 years' imprisonment for these offenses.
 {¶ 2} Gandy now appeals, arguing that he was deprived of a fair trial because he was compelled to stand trial in identifiable jail clothing; that his convictions were not supported by the manifest weight of the evidence; that he did not receive a fair trial before an impartial judge; that he was deprived of the effective assistance of counsel; and that the trial court made unconstitutional findings when imposing his sentence.
 Identifiable Jail Clothing {¶ 3} In his first assignment of error, Gandy argues that he was deprived of a fair trial and due process of law when the trial court compelled him to stand trial in identifiable jail clothing.
 {¶ 4} The United States Supreme Court addressed this issue inEstelle v. Williams.[2] The Court recognized that a defendant may be prejudiced by appearing in jail clothing, but also acknowledged that a defendant may purposefully elect, as a matter of trial strategy, to stand trial in such attire.[3] Recognizing these conflicting principles, the Court chose not to impose a rule requiring that all convictions in which the defendant has worn jail clothing be overturned. "Instead, the inquiry must focus on whether the accused's appearance before the jury in jail clothes was compelled."[4]
 {¶ 5} In the present case, the record does not indicate that Gandy was compelled to stand trial in jail clothing. The record contains no objection from Gandy concerning his attire. "[T]he failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."[5] And in addition to the absence of any objection from Gandy, we note that, in an attempt to prevent any potential influence, the trial court instructed the jury that it could not consider Gandy's attire in determining guilt or innocence. Gandy's first assignment of error is overruled.
 Manifest Weight {¶ 6} In his second assignment of error, Gandy argues that his convictions were not supported by the manifest weight of the evidence. When analyzing a challenge to the weight of the evidence, this court reviews the record, weighs the evidence, considers the credibility of the witnesses, and determines whether the jury clearly lost its way and created a manifest miscarriage of justice.[6]
 {¶ 7} As we have stated, Gandy was convicted of the attempted murder and felonious assault of Terry Douglas.
 {¶ 8} At trial, the state presented eyewitness testimony from three people, Douglas, Freddie Gentry, and Bruce Bennett. Terry Douglas testified that on the day of the shooting, February 16, 2005, he had been visiting his mother, Yvette Jones. Jones lived near the intersection of 13th and Walnut Streets, in an area of Cincinnati commonly referred to as Over the Rhine. Around 8:30 in the evening, Douglas left his mother's apartment to walk with his cousin to a nearby bus stop. On his return walk, Douglas noticed Gandy walking behind him. Douglas testified that he had recognized Gandy's face, but did not know Gandy's name at that point. Douglas stated that he later learned that this person's name was "DJ," Gandy's apparently well-known nickname.
 {¶ 9} After returning from the bus stop, Douglas stood near the intersection of 13th and Walnut Streets conversing with Freddie Gentry, a friend he had met through his sister. Gandy approached Douglas and Gentry. Douglas testified that Gandy ordered him to "strip man" and then proceeded to shoot him before Douglas could respond.[7]
 {¶ 10} Douglas was first shot in the leg and fell to the ground. He attempted to stand up, and Gandy shot him again. Douglas once more attempted to stand up and run to his mother's apartment, but he was shot for the third time. Douglas finally succeeded in reaching his mother's apartment, where he blacked out. Douglas testified that he was able to identify Gandy from a photo lineup as the individual who had shot him, and he additionally testified about his injuries and the treatment that he had received.
 {¶ 11} Freddie Gentry testified that he knew both Douglas and Gandy prior to the shooting. He referred to Gandy as "DJ." On the evening of February 16, 2005, Gentry was standing near the intersection of 13th and Walnut Streets. He testified that he saw Douglas and Gandy talking to each other, and watched them as they walked down 13th Street. After approximately five minutes, the two walked back up the street and stood with Gentry. Gandy told Douglas to walk around the corner with him, to which Douglas responded, "[Q]uit playing with me." Gandy then pulled out a gun and ordered Douglas to strip. Gentry testified that Douglas thought that Gandy was "playing," and that he attempted to grab the gun. At that point, Gandy shot Douglas.
 {¶ 12} Gentry testified that, as soon as Gandy fired the gun, he ran away. Gentry heard three more gunshots as he was running. He stated that he did not call the police for help because he had been on parole and was in violation of his curfew. He also revealed that he had a prior conviction for carrying a concealed weapon. Gentry eventually told the police what he knew, and he identified Gandy as the shooter from a photo lineup.
 {¶ 13} On cross-examination, Gentry admitted that he only came forward to testify because he was initially considered to be a suspect in the shooting. He also admitted that he had been selling drugs while on the street corner that night.
 {¶ 14} Bruce Bennett testified that, on February 16, 2005, he was a passenger in a vehicle that drove by the shooting as it occurred. While driving down Walnut Street, Bennett heard a gunshot and looked out his window. He saw a young man lying flat on the ground. He saw another man standing over this man and shooting him. The man on the ground attempted to get up and hobble away, but was shot again. Bennett was not able to identify the shooter, but stated that he had been wearing dark clothes and a skull cap. Bennett saw two or three other people standing around the scene, and he testified on cross-examination that he did not see anyone run after the shots were fired.
 {¶ 15} The state additionally presented the testimony of Officer Jason Rees. Rees responded to the shooting and was able to talk with Douglas before he was taken to the hospital. Rees asked Douglas who had shot him, and Douglas responded, "DJ." Douglas also told Rees that DJ had been wearing a gray or black coat and a black hood or skull cap.
 {¶ 16} Detective Robin Upchurch testified about her investigation into the shooting. Upchurch talked to Douglas' sister, who did not see the shooting occur, but apparently saw the shooter as he fled afterwards. The sister told Upchurch that it was common knowledge that "DJ" had shot her brother, and she directed Upchurch to the building into which the shooter had run. Upchurch went to the building, where a woman named Phyllis Matthews was living. Matthews stated that she and her son knew DJ, and she gave Upchurch a book bag that DJ had left there. The book bag contained a piece of homework with the name Jesse Gandy. Upchurch checked the name Jesse Gandy on the police computer system.A match was returned, and Upchurch obtained a photo lineup containing Gandy's picture. Upchurch testified that both Douglas and Gentry positively identified Gandy from the lineup. She additionally testified that Gentry was never a suspect in the shooting.
 {¶ 17} Although our review of the record has revealed several discrepancies in various witness' testimony, we cannot conclude that Gandy's convictions were against the manifest weight of the evidence.
 {¶ 18} Gentry testified that Douglas attempted to grab the gun from Gandy, whereas Douglas testified that he was shot before he had time to react. And while Douglas testified that he was not familiar with Gandy's name at the time of the shooting, Officer Rees testified that Douglas identified his shooter as "DJ." And although Gentry testified that he ran when Gandy began shooting, Bennett testified that he did not see anyone run from the scene.
 {¶ 19} As we consider these discrepancies, we are mindful that the shooting happened quickly, and that each witness had a different vantage point. We also note that the discrepancies did not alter the solid identification testimony provided by both Douglas and Gentry. And although Bennett did not witness anyone run from the scene, his description of the shooting and of the suspect's clothing corroborated the testimony of both Douglas and Officer Rees.
 {¶ 20} The jury was entitled to judge the credibility of the witnesses, and we cannot say that it lost its way and created a manifest miscarriage of justice. Accordingly, we conclude that Gandy's convictions were supported by the manifest weight of the evidence, and we overrule Gandy's second assignment of error.
 The Trial Court's Bias {¶ 21} In his third assignment of error, Gandy argues that he was deprived of his constitutional right to a trial before an impartial judge. Gandy argues that the trial court was biased against him, and to support his argument he cites to comments made by the trial court after the jury had returned its verdict but before the sentence was imposed.
 {¶ 22} The current appeal is not the proper place to raise this argument. As this court has previously held, "the proper avenue for redress when a party believes that the trial judge is biased is the filing of an affidavit of bias and prejudice with the Supreme Court of Ohio."[8] This procedure is provided for in R.C. 2701.03. Gandy has failed to file such an affidavit.
 {¶ 23} But because this argument is also relevant to Gandy's fourth assignment of error, we have considered it and have found no merit in his allegations of bias.[9] A trial court is presumed to be fair and impartial.[10] Nothing in the record indicates that the trial court behaved to the contrary. Gandy's specific allegations of bias arose after the jury had returned its verdict, and accordingly they could only have prejudiced Gandy in the imposition of sentence. But no such prejudice actually occurred. The trial court's comments primarily concerned Gandy's criminal history and his behavior while being held prior to trial, and those were appropriate considerations for sentencing.
 {¶ 24} Gandy's third assignment of error is overruled.
 Ineffective Assistance of Counsel {¶ 25} In his fourth assignment of error, Gandy argues that he received ineffective assistance of counsel. He specifically argues that his counsel was ineffective for allowing him to stand trial in jail clothing and for failing to ask for the recusal of the biased trial judge.
 {¶ 26} To succeed on a claim of ineffective assistance of counsel, an appellant must demonstrate that counsel's performance was deficient and that the appellant was prejudiced by the deficient performance.[11]
Counsel will only be deemed deficient if his or her conduct "fell below an objective standard of reasonableness."[12] To demonstrate prejudice, the appellant must show that, but for counsel's deficient performance, the outcome of the proceedings would have been different.[13] When reviewing a claim of ineffective assistance, we are highly deferential of counsel's performance and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[14]
 {¶ 27} Gandy's counsel was not ineffective for allowing him to stand trial in jail clothing. We have already noted that, as a matter of trial strategy, many defendants elect to stand trial in such attire in hopes of engendering the jury's sympathy.[15] Counsel's decision toallow Gandy to stand trial in jail clothing did not fall below an objective standard of reasonableness. And considering the evidence of guilt presented during trial, we cannot conclude that the result of the proceedings would have been different but for Gandy's attire.
 {¶ 28} Nor was counsel ineffective in not asking for the trial court's recusal. We have already determined that Gandy's claims of bias were unsupported by the record. Accordingly, the trial court's recusal was not warranted, and counsel's performance was not deficient.[16]
Gandy's fourth assignment of error is overruled.
 Sentencing {¶ 29} In his fifth assignment of error, Gandy argues that he must be resentenced in light of the Ohio Supreme Court's recent decision inState v. Foster.[17] Gandy is correct.
 {¶ 30} As we have stated, Gandy received an aggregate sentence of 29 years' imprisonment. The trial court imposed the maximum sentence for each of Gandy's offenses and ordered the sentences to run consecutively. Before imposing these maximum and consecutive sentences, the trial court made findings under R.C. 2929.14(C) and 2929.14(E)(4) to justify the sentences.
 {¶ 31} In Foster, the Ohio Supreme Court determined that both R.C.2929.14(C) and 2929.14(E)(4) were unconstitutional because they required judicial factfinding before the imposition of maximum and consecutive sentences.[18] But the court determined that both these provisions were capable of being severed,[19] and that trial courts no longer needed to "make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."[20]
 {¶ 32} Because Gandy was sentenced under these unconstitutional provisions, we sustain his fifth assignment of error, vacate his sentence, and remand for resentencing in compliance withFoster. In all other respects, the trial court's judgment is affirmed.
Judgment affirmed in part, sentence vacated, and cause remanded.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] Gandy was acquitted of robbery and two counts of aggravated robbery.
[2] Estelle v. Williams (1976), 425 U.S. 501, 96 S.Ct. 1691.
[3] Id. at 504-505, 508.
[4] State v. Miller, 1st Dist. No. C-010543, 2002-Ohio-3296, at ¶ 9, citing State v. Dorsey (Apr. 23, 1998), 8th Dist. No. 72177.
[5] Estelle v. Williams, supra, 425 U.S. at 512-513.
[6] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[7] Douglas had been wearing newly purchased "State Property" branded clothing and Timberland boots.
[8] State v. Johnson (2000), 140 Ohio App.3d 385, 391,747 N.E.2d 863.
[9] See id. at 392-393.
[10] In re Disqualification of Kilpatrick (1989), 47 Ohio St.3d 605,606, 546 N.E.2d 929.
[11] Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052.
[12] Id. at 688.
[13] Id. at 694.
[14] Id. at 689.
[15] See Estelle v. Williams, supra, 425 U.S. at 508.
[16] See State v. Patel, 7th Dist. No. 03 BE 41, 2004-Ohio-1553, ¶ 73.
[17] State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,845 N.E.2d 470.
[18] Id. at paragraphs one and three of the syllabus.
[19] Id. at paragraphs two and four of the syllabus.
[20] Id. at paragraph seven of the syllabus.