DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, Vance L. Collins, appeals his conviction entered by the Lucas County Court of Common Pleas in the above-captioned case. For the reasons that follow, we affirm in part, and reverse in part, the judgment of the trial court.
 {¶ 2} This case arises out of a four-count indictment that was issued against appellant. Counts 1 and 2 of the indictment charged him with rape, in violation of R.C. 2907(A)(2) and (B). Count 3 charged him with aggravated burglary, in violation of R.C. *Page 2 2911.11(A)(1), and Count 4 charged him with kidnapping, in violation of R.C. 2905.01(A)(2). All of the offenses were charged as felonies of the first degree.[1]
 {¶ 3} On October 31, 2005, the matter proceeded to jury trial. At that time, the following facts were adduced.
 {¶ 4} In the early morning hours of December 3, 2004, 56 year-old Margaret H., while sitting in her home reading, heard a knock at the front door. Thinking that it was her neighbor perhaps coming to borrow something, she got up and went to the door. She looked out, but, due to the darkness and the fact that her porch light was not working, she could not see who was there. When she cracked the door open for a better look, she saw an adult male stranger. The stranger asked her whether the car in the driveway was hers. When she answered that it was, he told her that her tires were slashed.
 {¶ 5} Margaret said that she would take care of it, and tried to shut the door, at which point the stranger pushed the door open, forced his way into the home, and began demanding money. When Margaret told him that she did not have any money, he grabbed her and pulled her into a bedroom off the dining room.
 {¶ 6} As Margaret struggled to push the stranger away, he told her several times that if she did not stop fighting, he would break her jaw. Once in the bedroom, he pushed her down on the floor and climbed on top of her. Margaret saw a screwdriver lying on the floor in a corner, but before she could get it, the stranger grabbed it and put it in his *Page 3 
pocket. Next, she tried to access a cell phone that was in her pocket, but when the stranger realized that she had it, he took it from her.
 {¶ 7} The stranger removed Margaret's sweatshirt, then dragged her through the dining room to the kitchen, where he turned off the light. At this point, Margaret-fearing for her life, and realizing that she could not fight off her attacker — stopped struggling. Her assailant proceeded to drag her back to the bedroom, and then to the living room, turning off lights in both rooms as he went. After turning out the light in the living room, he laid Margaret on the couch. He forced her to suck his tongue, then removed his pants and tried, unsuccessfully, to have vaginal intercourse with her. He pulled Margaret onto the floor to continue his assault — at this point telling her not to look at him and attempting to cover her face with a black cloth in order to prevent her from seeing him. When she told him to stop, that he was hurting her, he began to penetrate her vagina with his fingers. He then forced her to perform oral sex on him. After ejaculating in her mouth, he rubbed his penis over her face.
 {¶ 8} After completing the sexual assault, the assailant rolled Margaret onto her stomach and made her place her hands behind her back. He tied her up with a sheet, and again threatened that he would break her jaw. And, again, he asked for money. When Margaret told him that she did not have any, he began rummaging through the house. He asked her where her wallet was, and she told him it was in the kitchen. The attacker went into the kitchen, got the wallet, and took her keys (which had been located next to the wallet, on the kitchen counter). *Page 4 
 {¶ 9} Margaret heard the back door shut and, realizing that her attacker was no longer in the house, she untied herself. She heard someone on the porch, and when she went over to make sure the door was locked, she saw her attacker as he, first, tried to use her keys and, then, ran down the porch steps toward her car. He subsequently started the car and drove away.
 {¶ 10} The total amount of time that elapsed from the time the assailant entered her home until he left was approximately 45 minutes.
 {¶ 11} Following the attack, Margaret ran to a neighbor's house, where she called the police. When the police arrived, Margaret described her assailant as a 6' 2" tall black male, weighing about 200 pounds. She stated that he had high cheekbones and sunken cheeks, and that he was wearing a black skull cap, a dark shirt or jacket, and dark pants.
 {¶ 12} Margaret was taken to the hospital for treatment, where she was examined for evidence of rape, and was determined to have external and internal injuries consistent with a physical and sexual assault. DNA evidence was obtained from Margaret's face, and a rape kit was processed.
 {¶ 13} During the subsequent investigation of this case, police developed a lead identifying appellant as a suspect in this case. On June 24, 2005, a search warrant was executed, and buccal swabs and DNA samples were taken from appellant. The Ohio Bureau of Criminal Identification and Investigation performed PCR DNA testing of evidence, including the rape kit and the DNA samples obtained from appellant. *Page 5 
According to testimony by the state's expert, appellant was the major source of the DNA found on Margaret's face immediately after the rape.
 {¶ 14} At trial, Margaret positively identified appellant as the individual who, on the day in question, had forced his way into her home, raped her, and stolen her wallet, cell phone, and car.
 {¶ 15} On November 2, 2005, the jury returned a verdict of guilty as to all four counts. On November 23, 2005, appellant was sentenced to serve ten years in prison as to each count, with each sentence to be served consecutively, for a total period of incarceration of 40 years. The trial court specifically based its consecutive sentence on judicial findings of fact pursuant to R.C. 2929.14(E)(4).
 {¶ 16} Appellant timely appealed his conviction and sentence, raising the following assignments of error:
 {¶ 17} I. "PREJUDICIAL ERROR WAS COMMITTED WHEN THE TRIAL COURT ALLOWED THE STATE'S DNA EXPERT TO TESTIFY ABOUT DNA STATISTICS WHEN THE EXPERT BASED THOSE STATISTICS SOLELY UPON A STATISTICAL PROGRAM SUPPLIED BY THE FBI WITHOUT FIRST REQUIRING THE STATE TO LAY A FOUNDATION THAT THE FBI'S STATISTICAL PROGRAM WAS RELIABLE AND ITS METHODOLOGY ACCEPTABLE."
 {¶ 18} II. "THE APPELLANT'S SENTENCE TO CONSECUTIVE TERMS CONSTITUTES REVERSIBLE ERROR AS R.C. 2929.14(E)(4), THE STATUTE *Page 6 
UNDER WHICH THE TRIAL COURT IMPOSED ITS SENTENCE, WAS AND IS UNCONSTITUTIONAL."
 {¶ 19} III. "IT WAS PREJUDICIAL ERROR FOR THE TRIAL COURT NOT TO CONDUCT AN INQUIRY DIRECTLY WITH THE ACCUSED TO DETERMINE IF HE KNOWINGLY AND INTELLIGENTLY WAIVED HIS CONSTITUTIONAL RIGHT TO BE TRIED IN CIVILIAN CLOTHES BEFORE THE TRIAL COURT PROCEEDED WITH A JURY TRIAL WHILE THE ACCUSED WAS ATTIRED IN PRISON CLOTHES."
 {¶ 20} IV. "APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS UNDER SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION."
 {¶ 21} We begin with appellant's first assignment of error, wherein he argues that the trial court erred when it admitted into evidence statistical findings concerning the probability that appellant's DNA would match another person's DNA. Specifically, appellant objects to the testimony by forensic scientist Stacy L. Violi, wherein she stated that "[b]ased on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the major DNA profile identified on the left cheek/face swab [i.e., the DNA profile that matched appellant's DNA profile] is one in 18 trillion 60 billion individuals." Appellant contends that this statistical evidence was *Page 7 
inadmissible because the state failed to demonstrate that it was reliable and based upon valid principals and methods.
 {¶ 22} The Supreme Court of Ohio has recently held: "DNA evidence expressed in terms of population frequency is admissible if it is relevant. Questions regarding the reliability of DNA evidence in a given case, including DNA statistics on population frequency, go to the weight of the evidence rather than its admissibility." State v. Faust,105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 85.
 {¶ 23} Here, there is no question but that the statistical evidence was relevant. After testifying that the expected frequency of the major DNA profile on the left cheek/face swab was one in 18 trillion 60 billion individuals, the state's expert, Violi, testified that the present population of the earth is "a little over 7 billion individuals." Given those statistics, Violi concluded, within a reasonable degree of scientific certainty, that appellant was the major source of the DNA on the left cheek/face swab.
 {¶ 24} As indicated by Faust, any questions regarding the reliability of Violi's statistical evidence would go only to the weight of the evidence, and not its admissibility. See, Faust, supra. For the foregoing reasons, appellant's first assignment of error is found not well-taken.
 {¶ 25} Appellant argues in his second assignment of error that his sentence is unconstitutional pursuant to State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856. In Foster, supra, the Supreme Court of Ohio held that certain sections of Ohio's felony sentencing scheme, in particular those which involved judicial fact-finding, were unconstitutional. *Page 8 
Among the sections affected by this decision was R.C. 2929.14(E), which relates to consecutive sentences. Id., at paragraph three of the syllabus. Because the trial court relied upon this formerly-mandated-but-now-declared-unconstitutional section, we are required to find appellant's second assignment of error well-taken and to remand this matter for resentencing.
 {¶ 26} Appellant argues in his third assignment of error that the trial court erred in failing to conduct an inquiry directly with appellant to determine whether he knowingly and intelligently waived his constitutional right to be tried in civilian clothes.
 {¶ 27} The United States Supreme Court held, in Estelle v.Williams (1976), 425 U.S. 501, that a defendant's right to due process is violated when he is compelled to stand trial before a jury while wearing identifiable prison clothing. Id., at 512. At the same time, the court declined to establish a per se rule that would invalidate any conviction where the accused wore prison garb at trial. Id.; see also,State v. Smith, 2d Dist. No. 21058, 2006-Ohio-2365, ¶ 26. In reaching its decision, the court recognized both that a defendant may be prejudiced by appearing in jail clothing and that a defendant might purposely elect, as a matter of trial strategy, to stand trial in such attire. Id., at 504-505; see also, State v. Gandy, 1st Dist. No. C-050804, 2006-Ohio-6282, ¶ 4. Taking into consideration these apparently opposing principles, the relevant inquiry becomes not merely whether the defendant appeared before the jury in prison attire, but, rather, whether his appearance, so attired, was compelled.Estelle, supra, at 507; Gandy, supra, at ¶ 4; and Smith, supra, at¶ 26. *Page 9 
 {¶ 28} In the instant case, the trial court addressed the matter of appellant's refusal to wear civilian clothes prior to the jury's entrance into the courtroom. At that time, the following exchange took place between the trial court, appellant, and appellant's attorney, John W. McMahon:
 {¶ 29} THE COURT: "The record should reflect that Mr. Collins is in a Lucas County Corrections Center jumpsuit. Mr. Collins, were you given an opportunity to put on civilian clothes?"
 {¶ 30} APPELLANT: "Your Honor, ain't no clothes going to free me. The facts will free me, so I'm not worried about no clothes."
 {¶ 31} THE COURT: "There aren't any clothes that what?"
 {¶ 32} APPELLANT: "Clothes is not going to free me, Your Honor."
 {¶ 33} THE COURT: "That's not the question. The question is this. Were you offered an opportunity to put on some clothes other than the Lucas County Jail's jumpsuit?"
 {¶ 34} APPELLANT: "Yes, I was."
 {¶ 35} THE COURT: "And you chose not to?"
 {¶ 36} APPELLANT: "I chose not to."
 {¶ 37} THE COURT: "Okay. You understand that you have a right to wear what we call civilian clothes?"
 {¶ 38} APPELLANT: "I know all them rights, Your Honor."
 {¶ 39} THE COURT: "And you're choosing not to do that?" *Page 10 
 {¶ 40} APPELLANT: "Choose not to do that."
 {¶ 41} THE COURT: "And you understand that while I will instruct the jury that they're not to draw any inference from the manner in which you are dressed that that could conceivably work against your best interest. You understand that?"
 {¶ 42} APPELLANT: "I understand that."
 {¶ 43} THE COURT: "And knowing that you still wish to wear that jumpsuit?"
 {¶ 44} APPELLANT: "I understand that."
 {¶ 45} THE COURT: "Mr. McMahon, have you counseled your client on dressing out as we call it or wearing civilian clothes?"
 {¶ 46} MR. McMAHON: "Yes, Your Honor. As the Court knows, this is the second day that we had what we thought was a firm trial date. The first day was, I think, September 6th, and I made arrangements with Mr. Collin's wife, Bionca, to take civilian clothes to the jail, and she did. When we appeared on the morning of — which I believe is September 6th, I was quite surprised that he did not dress out that morning.
 {¶ 47} "Since that day obviously it's been reset, and as recently as yesterday I've discussed this with Mr. Collins, and I begged him. I've asked him please to wear civilian clothes, but he has chosen not to."
 {¶ 48} THE COURT: "And you certify for the record that this is a choice he makes of his own free will?"
 {¶ 49} MR. McMAHON: "I believe it is, Judge." *Page 11 
 {¶ 50} THE COURT: "Understanding all the consequences and adverse inferences that could be made against him?"
 {¶ 51} MR. McMAHON: "We've spoke that a jury may infer guilt or infer danger to the public dressing in the Lucas County garment."
 {¶ 52} THE COURT: "Okay. Well, we're going to proceed with trial. I will instruct the jury that they are to draw no inference from the manner in which Mr. Collins is dressed. He's made a choice of his own free will. The record will reflect it's a knowing, intelligent choice with an understanding of the adverse inferences that a jury may take into consideration."
 {¶ 53} The trial court went on to instruct the jury panel that it was to draw no inferences from appellant's dress, that it was just a matter of choice.
 {¶ 54} The record makes clear that appellant was in no way compelled to wear his jail garb at trial. To the contrary, he insisted upon it — even after the trial court cautioned him that doing so could work against his best interest.
 {¶ 55} We note that the trial court, exercising an abundance of caution, inquired not just of appellant, directly and at length, but also of defense counsel concerning appellant's choice of dress. Defense counsel's statements in response to this inquiry unequivocally reinforced that which appellant himself had just made plain — that appellant's choice of appearing at trial in jail clothing was made of his own free will, and was knowingly and intelligently made. Appellant's third assignment of error is found not well-taken. *Page 12 
 {¶ 56} Finally, appellant argues in his fourth assignment of error that his counsel provided ineffective representation when he failed to assert a challenge for cause against juror Burton. In order to prove a claim of ineffective assistance of counsel, a defendant must demonstrate: 1) that counsel's performance fell below an objective standard of reasonableness; and 2) that the defendant was prejudiced by counsel's ineffectiveness. Strickland v. Washington (1984),466 U.S. 668, State v. Bradley (1989), 42 Ohio St.3d 136.
 {¶ 57} In the instant case, appellant argues that trial counsel was ineffective in failing to assert a challenge for cause against juror Burton, because juror Burton "had clearly expressed that she could not be fair to the appellant in deciding the merits of the case."
 {¶ 58} In reviewing this assignment of error, we look to the following colloquy, which occurred between the trial court and, at the time, potential juror Burton, during voir dire inquiry by the court:
 {¶ 59} THE COURT: "Do any of you have any family members or friends that have served in a prosecutor's office? That could be the Lucas County Prosecutor's Office, U.S. Attorney's Office, any prosecutor's office in any of the outlying courts or any other state? * * *"
 {¶ 60} "* * *"
 {¶ 61} MS. BURTON: "I know Ken Walz. I think he works here for the prosecuting attorney." *Page 13 
 {¶ 62} THE COURT: "Yeah."
 {¶ 63} MS. BURTON: "But he's just a friend."
 {¶ 64} THE COURT: "You talk to him about his job?"
 {¶ 65} MS. BURTON: "No. Just see him a couple of times a year with a group of friends."
 {¶ 66} THE COURT: "If you felt based upon the law and the evidence that not guilty verdicts were appropriate, would you render those without any concern as to what you might have to say to Mr. Walz when you saw him?"
 {¶ 67} MS. BURTON: "No."
 {¶ 68} Appellant, in making his claim that Burton expressed an inability to be fair in this case, apparently looks solely to Burton's one-word answer to the trial court's rather lengthy and complex final question. We find that a better way to consider this matter is to view the colloquy as a whole. In such case, we learn that, although Burton did know prosecutor Walz, she did not talk to him about his job, that he was just a friend, and that she only saw him a couple of times a year with a group of friends. Thus, the record demonstrates that Burton's relationship to Walz was merely one of casual acquaintance.
 {¶ 69} Further — this time based on our review of the entirety of the record, including the remainder of the court's voir dire inquiry — we conclude that Burton's verbal response to the trial court's final question was not an accurate reflection of the Burton's intent, and that Burton was, in fact, capable of rendering a fair and impartial verdict. *Page 14 
 {¶ 70} As additional support for this conclusion, we note that Burton's answer to the trial court's final question did not give rise to any follow-up questioning by the court. R.C. 2945.25(B) provides that a juror will not be disqualified for cause:
 {¶ 71} "* * * if the court is satisfied, from examination of the juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at trial[.]"
 {¶ 72} Apparently, the trial court, like this court, was so satisfied. As there was no basis for disqualifying Burton for cause, trial counsel's failure to make such a challenge cannot be said to constitute conduct falling below an objective standard of reasonableness, and, therefore, cannot be said to have denied appellant effective assistance of counsel. See State v. Cope (Feb. 17, 1988), 9th Dist. No. 13213 (Concluding that absent a basis for disqualification of a juror for cause, trial counsel's failure to so move did not deny the defendant effective assistance of counsel.) Accordingly, appellant's fourth assignment of error is found not well-taken.
 {¶ 73} For all of the foregoing reasons, the judgment of the Lucas County Court of Common Pleas is affirmed in part, and reversed in part, with the judgment being reversed only with respect to appellant's sentence. This matter is remanded to the trial court for additional proceedings consistent with this decision. Appellant and appellee are ordered to divide the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED IN PART, AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
[1] Each of the offenses additionally carried a repeat violent offender specification. However, those specifications were all dismissed by the prosecution on the first day of trial. *Page 1