[Cite as *State v. Smith*, 2013-Ohio-756.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO.   11 MA 120 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | O P I N I O N |
| | ) | |
| SAMMIE SMITH, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Criminal Appeal from Common Pleas Court, Case No. 09CR1197. |
| JUDGMENT: | Affirmed in part; Reversed in Part; Remanded. |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee: | Attorney Paul Gains<br>Prosecuting Attorney<br>Attorney Ralph Rivera<br>Assistant Prosecuting Attorney<br>21 West Boardman Street, 6th Floor<br>Youngstown, Ohio  44503 |
| For Defendant-Appellant: | Attorney Lynn Maro<br>7081 West Boulevard<br>Youngstown, Ohio  44512 |

JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  March 1, 2013

VUKOVICH, J.

{¶1} Defendant-appellant Sammie Smith appeals after being convicted of multiple crimes in the Mahoning County Common Pleas Court. He raises nine assignments of error, querying: whether the DNA analyst's supervisor could testify in place of the analyst; whether a witness was qualified to lay the foundation for introducing appellant's time sheets as business records; whether the sentences on the repeat violent offender specifications were proper; whether the kidnapping charges should have been merged with the rape charges; whether the court's curative instruction mitigated the victim's disclosure that the suspect was in jail when the police told her of the DNA match; whether it was improper for the prosecutor to comment that the defense could have retested the sample; whether we can review the motion in limine ruling admitting appellant's prior convictions, even though appellant never ended up testifying; whether counsel was ineffective with regards to two failures to object; and whether appellant's conviction was against the manifest weight of the evidence.

{¶2} All assignments of error, except the one involving sentencing, are overruled, and appellant's convictions are upheld. The additional five-year enhanced sentences for the repeat violent offender specifications on counts six and seven are reversed as they are unauthorized where the court did not impose a maximum sentence on either count. And, the five-year concurrent sentences on these counts are reversed and remanded for a limited resentencing hearing where the state can elect which offense it wishes the court to enter the five-year sentence on because two merged offenses cannot both receive sentences. The sentences on the other counts are affirmed.

<u>STATEMENT OF THE CASE</u>

{¶3} According to the testimony, a man broke into the victim's duplex in Youngstown, Ohio in the early morning hours of October 13, 2003. The victim was sleeping with her two-year-old son when the intruder shook her awake. (Tr. 471-472). He pulled a bandana over her eyes that she had been wearing on her hair. She did not fight or scream so as not to wake her child. (Tr. 477). The intruder

pulled her out of bed by her arms and walked her down the hallway and into the dining room. (Tr. 473, 475).

{¶4} At that point, the victim turned the light on and pulled the bandana down. (Tr. 474). She briefly glimpsed a black male. (Tr. 475). He smelled strongly of alcohol and a certain type of cigar. (Tr. 477). The intruder replaced the bandana over her eyes, grabbed her neck, and threatened to kill her. (Tr. 474-475, 477). He brought her into the living room, took off her clothes, and attempted unsuccessfully to vaginally rape her. (Tr. 475-476). He then forced her to perform oral sex on him. (Tr. 476).

{¶5} Thereafter, the intruder brought her back to her bedroom and put her in the closet while he rummaged through her bedroom drawers and stole her jewelry. (Tr. 478-479). He also stole money from her purse, which he emptied in her son's room. (Tr. 479). While the victim was in the closet, appellant ran a bath.

{¶6} He thereafter retrieved the victim from the closet and brought her into the hallway where he anally and then vaginally raped her. He used lotion from her closet and did not use a condom. (Tr. 480-481).

{¶7} Finally, he made her take a bath and wash herself. He watched her for a short time and then left. (Tr. 482). She estimated that the incident took place over the course of an hour.

{¶8} After ensuring the intruder was gone, the victim called her husband to come get their son and then called the police, who arrived with an ambulance that took her to the hospital. (Tr. 484). The police discovered evidence such as a broken window pane in a door, broken trim around the door, a bathtub with water and a cloth in it, a bottle of lotion in the hallway, and the victim's sweatpants on the floor in the living room.

{¶9} The victim was examined by an emergency room doctor and nurse, who were both involved in preparing the rape kit and who testified about the victim's statements and condition. The physician disclosed that the victim had tears on both sides of her vagina and around her rectum. These areas were swollen and tender,

establishing a recent trauma. (Tr. 324). He described it as the worst trauma to those areas that he had yet encountered. (Tr. 325).

{¶10} The nurse noted that the victim had additional bruising around her left nostril. (Tr. 336, 357). She also related that the victim was experiencing pain in her rectum. (Tr. 337). The nurse opined that the victim seemed to be in need of emotional support. (Tr. 336-337).

{¶11} The rape kit was sent to BCI. An analyst testified that she opened the kit to test for the presence of sperm on the swabs. (Tr. 287, 289). She found sperm on the vaginal and rectal swabs. (Tr. 290). The swabs were then sent to BCI's outsourcing provider at the time, Bode Technology. Said company generated a DNA profile from the sperm found on the vaginal swab and returned it to BCI, who entered the profile into their database. (Tr. 365, 368). The supervisor of the analyst who generated the profile presented that profile at trial.

{¶12} It was not until 2008 that a match occurred as appellant's DNA had been recently entered in the database. (Tr. 578). Officers showed the victim a photographic array containing appellant's picture. She could not positively identify appellant, but she narrowed the six suspects down to two, one of whom was appellant. (Tr. 581).

{¶13} Officers then obtained a new sample of DNA from appellant, which they submitted to BCI. (Tr. 583). A BCI analyst testified that she generated appellant's DNA profile from the new sample and compared it the DNA profile of the sperm generated by Bode from their analysis of the vaginal swab. (Tr. 368). She found to a reasonable degree of scientific certainty that all core locations on the two profiles matched. (Tr. 375, 380). She explained that this match results in a conclusion that the person tested "cannot be excluded as the source," noting that such matching between individuals has never been observed except in identical twins. (Tr. 375-376, 378). She further testified that the frequency of this match was one in 15 quadrillion 450 trillion, pointing out that Earth's population was 6.5 billion. (Tr. 381).

{¶14} As a result of this evidence, appellant was indicted on eight counts: aggravated burglary; rape (fellatio); rape (vaginal); rape (anal); kidnapping (to

facilitate a felony); aggravated robbery; robbery (as an alternative to aggravated robbery); and kidnapping (to engage in sexual activity against the victim's will). A repeat violent offender specification was added to each count. A jury found appellant guilty as charged.

{¶15} The state agreed aggravated robbery and robbery were tried in the alternative and would merge. In an August 8, 2011 entry, the court sentenced appellant to ten years on each count except the merged counts on which the court entered five-year concurrent sentences. The court ran the ten-year sentence on aggravated burglary, the ten-year sentences on the three rapes, and the five-year year sentence on the merged offenses consecutively and ran the two kidnapping sentences concurrently to each other and to the other sentences. This amounted to an aggregate sentence of 45 years. The court then found that appellant was a repeat violent offender and imposed an additional five years on each count, increasing the aggregate sentence by 35 years to a total of 80 years.

{¶16} Appellant filed a timely notice of appeal. Appellant received leave to file a forty-seven page brief containing nine assignments of error.

<u>ASSIGNMENT OF ERROR NUMBER ONE</u>

{¶17} Appellant's first assignment of error contends:

{¶18} "APPELLANT WAS DENIED DUE PROCESS AND CONFRONTATION WHEN THE TRIAL COURT PERMITTED WITNESSES TO OFFER EXPERT TESTIMONY ABOUT DNA TESTS NOT PERFORMED BY THEM IN VIOLATION OF [THE CONSTITUTION]."

{¶19} In order to conclude that appellant's DNA matched the sperm found on the vaginal swab from the rape kit, the BCI analyst, who profiled appellant's known sample in 2008, compared that sample to the DNA profile from the rape kit, which had been generated by Bode Technology and returned to BCI. Appellant argues that the BCI analyst's testimony (finding that appellant's DNA matched the profile of the sperm from the rape kit) was improperly admitted because that testimony relied on the DNA profile of the sperm, but the analyst who generated that profile did not testify.

**{¶20}** Instead, the state presented the testimony of Mr. Cariola, Bode's senior vice-president of forensic operations. At the time the rape kit was profiled, Mr. Cariola was the technical leader of Ms. Lawsen, the analyst who worked on that sperm sample and who no longer worked for Bode. In general, Mr. Cariola oversaw all technical aspects of the analysts' work, approved procedures, assured reliability, reviewed protocols, approved the hiring analysts, conducted DNA analysis, and reviewed the final product of analysts. (Tr. 411). He presented the DNA profile generated by Bode. State's Exhibit 32.

**{¶21}** Appellant focuses on the fact that Ms. Lawsen separated the sperm from the nonsperm, quantitated the DNA to see how much was there, amplified the DNA, and put the DNA into the analyzer to generate the results. (Tr. 431-436). Mr. Cariola did not participate in or watch these steps. Mr. Cariola did, however, run the purification step between separation and quantification himself. (Tr. 433). And, he was not only the technical leader but was also the cosigner of the report. (Tr. 419). He explained that this meant that he reviewed all of the notes and raw material generated and came to the same conclusion as the analyst. (Tr. 419-420).

**{¶22}** Appellant's argument here is based upon cases out of the United States Supreme Court regarding what is testimonial evidence and who can introduce lab results. *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 311, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) (certificate of analysis saying that seized evidence was cocaine requires live testimony of the analyst who did the analysis); *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 2716, 180 L.E.2d 610 (2011) (surrogate testimony of another analyst is insufficient to introduce blood alcohol content results).

**{¶23}** However, the *Bullcoming* Court did observe that the testifying analyst did not offer an independent opinion on the blood alcohol content results but just introduced the other's analyst's certification. *Bullcoming*, 131 S.Ct. at 2716. And, as the state points out, Justice Sotomayor's concurrence emphasized the limited reach of the holding by pointing out that they were *not* facing a case where "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." *Id.* at 2722 (Sotomayor, J., concurring).

She noted that the witness played no role in producing the report on blood alcohol content and did not observe any portion of the non-testifying analyst's conduct of the testing. *Id.* "It would be a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results. We need not address what degree of involvement is sufficient because here [the witness] had no involvement whatsoever in the relevant test and report." *Id.*

{¶24} We refrain from extending the United States Supreme Court's holdings any further than they expressly reach. The case before us is distinguishable from the cases discussed above as this was not some random coworker testifying to someone else's results. Considering the involvement of Mr. Cariola in the generation of the DNA profile from the rape kit, this case does not fall under the rubric of the *Bullcoming* and *Melendez–Diaz* cases.

{¶25} That is, Mr. Cariola was more than a mere fellow analyst of Ms. Lawsen. He was the technical leader who supervised her. He reviewed procedures, protocols, and work product at Bode. And, he reviewed all of Ms. Lawsen's notes and her raw data at the time it was generated. He cosigned her report and testified that her conclusions were also his conclusions. In fact, he was the actual analyst who performed the purification step before Ms. Lawsen completed the analysis. And, he was cross-examined on the procedures used in the lab he oversaw when analysts identify stutters and "clip" the peaks and all other procedures the defense wished to criticize. Furthermore, he had his own independent opinion on the results.

{¶26} Consequently, the failure to present the testimony of Ms. Lawsen on her generation of the DNA profile from the rape kit did not violate appellant's Confrontation Clause rights. Thus, we conclude that the BCI agent was permitted to use the prior DNA profile to conduct her comparison with the sample she profiled.

{¶27} We also note here that appellant failed to object during Mr. Cariola's testimony. As appellant raises this failure to object under his ineffective assistance of counsel argument in assignment of error number eight, we do not rely on waiver here but rather conclude a lack of deficiency and a lack of prejudice based upon the above analysis.

**{¶28}** In further and independent support of this conclusion, the state urges that regardless of the validity of presenting a supervisor and reviewer to testify in place of the analyst who created the profile, there is another reason that the BCI agent's comparison testimony was valid. A plurality of the United States Supreme Court recently ruled on the state's calling of an expert who testified that a DNA profile produced by an outside lab matched a profile produced by the state police lab using a sample of the defendant's blood. *See Williams v. Illinois*, 132 S.Ct. 2221, 2227, 183 L.Ed.2d 89 (2012). First, the plurality pointed out that an expert may express an opinion that is based on facts that the expert is asked to assume to be true, and thus, concluded that an expert can testify that DNA results match. *Id.* at 2228.

**{¶29}** The plurality went on to hold that even if the report produced by the outside lab is admitted into evidence, there is no Confrontation Clause violation. *Id.* The DNA report was found to be very different from the sort of extrajudicial statements that the Confrontation Clause reaches as it was produced before any suspect was identified and was not generated for the purpose of obtaining evidence against that defendant, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. *Id.* The plurality also explained that the DNA profile was not inherently inculpatory as a DNA profile is evidence that tends to exculpate all but one person on earth, noting that it is well-known that such evidence is regularly used to exonerate those wrongfully accused. *Id.*

**{¶30}** "If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable." *Id.*, citing *Perry v. New Hampshire*, 132 S.Ct. 716, 181 L.Ed.2d 694 (2012). The plurality opined that such a conclusion would not prejudice a defendant "who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial." *Id.*

**{¶31}** Although this was a plurality, Justice Thomas concurred in judgment and wrote separately where he concluded that the DNA lab report was not in the

class of testimonial evidence covered by the Confrontation Clause as it has no indicia of solemnity as does an affidavit or certificate of analysis. *Id.* at 2260-2261 (Thomas, J., concurring). Thus, a majority of justices on the United States Supreme Court would instruct this court to allow the DNA profile from the outside lab as evidence even without the testimony of the analyst who generated the report containing the profile.

{¶32} Here, the testifying BCI agent personally analyzed the DNA that was undisputedly that of appellant. She used her expertise to compare that sample to a prior profile entered into the database by her lab after their contractor generated a profile from an unidentified rapist's semen sample. As the United States Supreme Court has emphasized, the prior profile was generated before any suspect had been identified. *See id.* at 2228. It was not generated in order to provide proof against appellant, who was not even a suspect at the time. *See id.* In fact, four years passed before a database returned a match to appellant's recently entered sample, at which time yet another sample was obtained from appellant. A DNA profile is not inherently inculpatory as it regularly exculpates those wrongfully suspected or convicted. *See id.* As observed, it is hard to conceive that any purported error in analyzing an unknown rapist's semen would have produced a DNA profile that was identical to appellant's DNA profile. This coincidence is compounded by the fact that appellant had lived in the neighborhood, and at the time of the rape his mother lived in the victim's neighborhood.

{¶33} For the two independent reasons set forth above, the BCI analyst was permitted to compare appellant's DNA to the prior profile previously generated from the rapist's semen. Thus, appellant's arguments concerning the prior DNA profile are overruled.

{¶34} The other argument presented here is that the BCI analyst should not have been permitted to testify about the statistical frequency of the DNA profile occurring in the population because this number was produced by entering the profile into an FBI computer program containing an FBI-generated population database. (Tr. 381). Appellant filed a motion in limine to preclude the testimony on the population

frequency estimate and later lodged a timely objection at trial. (Tr. 380). Appellant believed that a knowledgeable FBI representative would have to testify as to how the database was established and how the number was derived. In responding below, the state urged that such evidence was widely accepted.

**{¶35}** The Ohio Supreme Court has ruled that an expert can testify to the statistical conclusions about DNA evidence without being an expert in statistical analysis. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836. The Court explained that questions regarding the reliability of statistics on population frequency go to the weight rather than the admissibility of the evidence. *Id.* (thus counsel was not ineffective for failing to object to the analyst's testimony on population frequency), citing *State v. Pierce*, 64 Ohio St.3d 490, 501, 597 N.E.2d 107 (1992). *See also State v. Adams*, 103 Ohio St.3d 508, 525, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 80-82.

**{¶36}** Various courts have ruled that an analyst's testimony on the population frequency estimate obtained from the FBI database was permissible and the statistic obtained was not testimonial evidence under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *See State v. Bolton*, 12th Dist. No. 96385, 2012-Ohio-169, ¶ 64; *State v. Bruce*, 5th Dist. No. 2006-CA-45, 2008-Ohio-5709, ¶ 62, 69; *State v. Powell*, 2d Dist. No. 18095 (Dec. 15, 2000); *State v. Breeze*, 10th Dist. No. 92AP-258 (Nov. 24, 1992). *See also State v. Collins,* 6th Dist. No. L-05-1399, 2007-Ohio-3578, ¶ 17, 21-24 (court can allow expert to testify on statistics even though they were solely the result of a statistical program supplied by the FBI); *State v. Stokes*, 8th Dist. No. 71654 (Dec. 11, 1997); *State v. Minor*, 47 Ohio App.3d 22, 24, 546 N.E.2d 1343 (10th Dist.1988) (expert can apply facts in evidence to scientific table).

**{¶37}** The BCI analyst testified that the chances of another person matching the DNA profile of the sperm from the vaginal swab were one in 15 quadrillion 450 trillion. (Tr. 381). She had been a forensic analyst for BCI for fourteen years. She has a bachelor's degree in biology. She testified in court 85 times in the past. (Tr. 385). She had training with the FBI in Quantico on DNA analysis and interpretation.

She took several courses on statistics and statistical interpretation. (Tr. 362). She explained the reason for this statistical training. (Tr. 363). *See State v. McKinney*, 11th Dist. No. 2007-T-0004, 2008-Ohio-3256, ¶ 123, 134 (finding this same expert qualified to testify as an expert on population frequency statistics).

**{¶38}** The analyst also disclosed that she is required by the duties of her job to generate the population frequency statistic from the FBI program. (Tr. 380). She answered the questions posed to her by defense counsel regarding the database. She explained that labs across the country and throughout the world rely on the FBI's database to generate their statistics and opined that there would be no sense for every individual lab to construct its own database and software program. (Tr. 407-408). She also testified that the use of the FBI's program to generate statistical population frequency estimates is widely accepted in the scientific community. (Tr. 408). Accordingly, appellant's argument on the population frequency testimony is overruled.

<u>ASSIGNMENT OF ERROR NUMBER TWO</u>

**{¶39}** Appellant's second assignment of error states:

**{¶40}** "THE TRIAL COURT ERRED IN PERMITTING HEARSAY EVIDENCE OF APPELLANT'S PAYROLL RECORDS IN VIOLATION OF [THE CONSTITUTION]."

**{¶41}** After the police were informed about the hit in the DNA database, a detective spoke to appellant. Appellant admitted that he returned to Youngstown on occasion to visit his mother but said that he had been living in Indiana at the time of the rape as he was working there for Project Management Services, a company based out of Girard, Ohio. (Tr. 582-583). The police then discovered that appellant previously lived with his mother on the same street where the rape took place. (Tr. 594).

**{¶42}** The rape took place over the course of an hour at approximately 4:00 a.m. on October 13, 2003. As additional evidence, the police wished to establish that appellant had not been working in Indiana that morning. The detective thus contacted appellant's prior employer and thereafter received appellant's time sheets

for the pertinent pay period. (Tr. 584, 588). Appellant unsuccessfully objected to the detective's testimony as to whether it appeared from the time sheets that appellant had been working on October 13, 2003. (Tr. 588).

{¶43} Regardless, this testimony had already come in through the testimony of the office manager of a drain cleaning company who answered the call from the detective and who supplied him with the payroll records. She testified that she worked for the drain cleaning company for three years, that she did not work for PMS, and that PMS and the drain cleaning company were once owned by her father. (Tr. 549). She stated that when the detective called, she went upstairs and found the payroll records from PMS in storage. (Tr. 548).

{¶44} The state presented the time sheets she found, and she explained that the employees fill them out themselves and turn them in. (Tr. 550); State's Exhibit 35. When asked if the time sheets were those of the defendant, appellant unsuccessfully objected without specifying the grounds of the objection. (Tr. 550). A side bar had been conducted prior to the presentation of the time sheets, but it was not conducted on the record. (Tr. 549). Through her testimony, it was established that the time sheet containing appellant's name included October 13, 2003 and that the hours for that date had been crossed out, meaning that he did not work that day. (Tr. 550-551).

{¶45} In viewing that time sheet, it can be seen that October 13, 2003 had been filled out by hand and that appellant worked 7:00 a.m. until 4:00 p.m. for a total of 8 hours (similar to some other days). The hours for that day, however, were crossed out. Similarly, the top of the time sheet which originally stated that he worked 44 hours was decreased to 36 hours, coinciding with the crossing out of October 13, 2003.

{¶46} On cross-examination, the defense pointed out that the witness was only 20 years old and did not work for PMS in 2003. (Tr. 552). She was asked if she was the custodian of records for PMS, and she stated that she was not. (Tr. 553). When asked what she knew about the procedure for filling out time sheets in 2003, she responded: "It never changed. It's always been the same, even for my

company. The same owner did the same thing with all the time sheets." (Tr. 554). She expressed her belief that the time sheets were submitted to her aunt, who then wrote out the payroll checks. (Tr. 554). She explained that the worker has to get the manager's signature on the time sheet to get paid, noting the manager's signature on the exhibit. (Tr. 555). It was pointed out that she did not know who crossed out October 13, 2003. (Tr. 555).

{¶47} At this point, the employee noted that she had the document showing how much appellant had been paid for each time period and how many hours he worked. (Tr. 556). Defense counsel marked that document as Defense Exhibit 3. (Tr. 556-557). Defense counsel asked if that document was kept in the ordinary course of business at PMS, and she responded that it had been. (Tr. 558). Defense counsel then elicited how many hours appellant had been paid for the two-week period including October 13, 2003 and asked the employee questions about the hours worked on particular days of the week. (Tr. 558-559).

{¶48} At the close of all evidence, the state moved to admit the time sheets as State's Exhibit 35. Defense counsel asked for a moment to respond. Thereafter, defense counsel came back on the record and voiced that he had no objection to the admission of the time sheets. (Tr. 598). In closing, defense counsel urged that appellant's work records corroborated that he was living in Indiana. (Tr. 621).

{¶49} On appeal, appellant contends that it was an abuse of discretion for the court to permit the state to introduce the timesheets in violation of Evid.R. 803(6) and Evid.R. 901. There are several problems with this argument here.

{¶50} First, there is no indication as to the basis for appellant's objection at trial. Error may not be predicated upon a ruling that admits evidence unless a substantial right was affected and a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context. Evid.R. 103(A)(1).

{¶51} The state already had the witness identify the timesheets that she found for the detective without objection. It was only when she was asked if they were the timesheets of Sam Smith that counsel objected. The grounds for the objection were

not stated. The court may have believed, for instance, that the objection was on grounds of how it was determined that this timesheet referred to this defendant. It may not have been clear to the trial court that the objection was based upon whether the timesheets should be admitted as business records. A side bar had been called by defense counsel earlier, but we remain unaware of what was discussed at this unrecorded conference.

**{¶52}** Even if the objection was sufficient to preserve the issue, the defense, after careful consideration, invited the court to admit the timesheets into evidence. Apparently, the defense believed that these timesheets in conjunction with the payroll record concerning the amount of the check for that time period was evidence that could work in appellant's favor. Notably, the defense marked a document from this same witness as an exhibit. As such, the defense ended up consenting to the admission of the payroll records and the employee's status regarding those records.

**{¶53}** In anticipation of this ruling, appellant's eighth assignment raises ineffective assistance of counsel in this regard. We relocate the analysis here.

**{¶54}** Counsel can be considered to have rendered ineffective assistance if there was deficient performance in the failure to object to a matter and there was prejudice, meaning that result of the proceeding would have been different but for that failure. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). Debatable trial tactics very rarely constitute ineffective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 47, 402 N.E.2d 1189 (1980). The reviewing court presumes that counsel's strategy falls within the wide range of reasonable assistance. *State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987).

**{¶55}** Deficient performance has not been established here as we do not second-guess trial strategy. Counsel may have decided that although the hours worked on October 13, 2003 had been crossed out somewhere along the line, the document was worth keeping as evidence. That is, the timesheet's original statement that appellant worked in Indiana at 7:00 a.m. on the morning of a 4:00 a.m. one-hour long home invasion in Youngstown, Ohio may be viewed as beneficial to

the defense. Counsel could have concluded that the timesheet with its alterations and contradictory arithmetic could create a reasonable doubt in the minds of the jurors.

{¶56} In any event, appellant's argument here concerning whether the office manager was a proper witness to authenticate the business records is without merit. The decision to admit a business record into evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent a clear showing of an abuse of discretion. *Bishop v. Munson Transp. Inc.*, 109 Ohio App.3d 573, 579, 672 N.E.2d 749 (7th Dist.1996). Authentication deals with identification and is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Evid.R. 901(A). An example of authentication is through testimony of a witness with knowledge that a matter is what it is claimed to be. Evid.R. 901(B)(1). A business record is authenticated as provided for in Evid.R. 803(6). *See* Evid.R. 902(B)(10) (any method provided by rule or statute). The hearsay exception for business records contained in Evid.R. 803(6) allows the admission of:

> "A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."

Evid.R. 803(6). *See also* Evid.R. 803(7) (absence of entry in business record).

{¶57} Appellant complains that the office manager for the drain cleaning company was not the custodian of the records for PMS and had no personal

knowledge of the records. He notes that this witness assumed that it was the defendant who filled out the time sheet.

**{¶58}** We begin by pointing out that presentation of business records through the testimony of the custodian of the records is not the only option. A witness sufficiently familiar with the operation of the business can also present the business records. *State v. Davis*, 62 Ohio St.3d 326, 342-343 581 N.E.2d 1362 (1991). *See also* Evid.R. 803(6) ("or other qualified witness"). The witness must be able to vouch, from personal knowledge of the record-keeping system, that such records were kept in the regular course of business. *Id.* at 342. The witness need not have personal knowledge of the creation of the particular record in question and need not have been in the employ of the company at the time the record was made. *Id.*

**{¶59}** Here, the witness testified that she had been working for her father's company for three years. She was the office manager. Her father previously owned the company that appellant worked for. When the police called requesting PMS payroll records, she knew to look upstairs for the old records in boxes for the old company. She found payroll records for that company for October 13, 2003 for a person named Sam Smith. Appellant's own admissions to police establish that he worked for PMS on October 13, 2003.

**{¶60}** Time sheets regularly made are maintained by a business. Moreover, the witness related that her aunt had been in charge of payroll in 2003. She testified that she had personal knowledge of the procedure for filling out time sheets, insisting that the procedure never changed and has always been the same at the two companies that her father owned. (Tr. 554). She explained that the employees would fill out their own time sheets, which were then reviewed and signed by a manager before the employee could submit the timesheet to her aunt to get paid. (Tr. 550, 555). And, the exhibit *introduced by the defense* confirmed that appellant had been paid at the end of the week for the amount of hours reported *after* the timesheet was changed.

**{¶61}** In conclusion, it was sufficiently established that the record was prepared by an employee of the business who had a duty to report the information,

the person providing the information had personal knowledge of the event reported, the record was prepared at or near the time of the event, and it was a regular practice or custom of the business to prepare the type of record. *See* Evid.R. 803(6). The witness who assisted in establishing these facts demonstrated that she had personal knowledge of the record-keeping system and that the records were kept in the regular course of business. *See Davis*, 62 Ohio St.3d at 342. It was irrelevant that she had no personal knowledge of the specific creation of the particular record in question and that she was not in the employ of the company at the time the record was made. *Id.*

{¶62} Under all of the facts and circumstances presented herein, we cannot say that the trial court clearly abused its discretion in determining that the employee was a qualified witness under Evid.R. 803(6). *See Bishop*, 109 Ohio App.3d at 579. Therefore, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER THREE

{¶63} Appellant's third assignment of error asserts:

{¶64} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER [THE CONSTITUTION] WHEN IT FOUND APPELLANT TO BE A REPEAT VIOLENT OFFENDER, AND ERRED AS A MATTER OF LAW IN IMPOSING ADDITIONAL PUNISHMENT ON THE REPEAT VIOLENT OFFENDER SPECIFICATION."

{¶65} Appellant was indicted on repeat violent offender specifications on each count. The specifications were left for the trial court to decide after the jury convicted him on the offenses. Thus, at the sentencing hearing, the state presented a certified copy showing prior convictions of aggravated robbery, kidnapping, and rape entered in Mahoning County Common Pleas Court Case Number 86CR151. The court found that appellant was a repeat violent offender and imposed an additional five-year sentence on each count. (We note that the court's entry speaks only of prior convictions for aggravated robbery and kidnapping even though the prior entry of conviction also contained a conviction for rape; this may be because the indictment only mentioned aggravated robbery and kidnapping in the RVO specifications.)

Appellant raises three arguments here concerning the repeat violent offender specifications.

{¶66} First, appellant contends that the state's proof of a prior conviction was insufficient as the mere production of a certified copy of a judgment entry showing a prior conviction for a Sam Smith does not establish that the person on trial is the same person referred to in the prior judgment entry. The state replies that the trial court was permitted to use the PSI in conjunction with the prior entry to determine that both referred to the same person, pointing out that the trial court specified that it considered the presentence investigation report.

{¶67} "Whenever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction." R.C. 2945.75(B)(1).

{¶68} As aforementioned, the repeat violent offender issue was resolved at sentencing. The PSI is part of the sentencing record on appeal. R.C. 2953.08(F)(1). There is no reason why the court could not use the PSI to find that appellant is the same person referenced in the certified copy of the 1986 conviction. *See State v. Smith*, 136 Ohio App.3d 343, 346, 736 N.E.2d 560 (8th Dist.2000) (where the court used the PSI to find sufficient evidence of prior convictions). *See also State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, 915 N.E.2d 292, ¶ 37-40 (allowing the trial court to look at the judicial record of the prior conviction to determine if the defendant should receive an enhanced RVO sentence and referring to the use of a PSI for this purpose).

{¶69} The PSI here contained a photograph of appellant, his date of birth, and his Social Security number. The PSI disclosed that appellant had previously been convicted in 86CR151 of kidnapping, rape, and aggravated robbery with a firearm specification. Thus, the PSI established that the defendant before the court had a criminal record which included those offenses in the same case number contained within the certified copy of the prior entry of conviction that the state presented to the

trial court at the RVO/sentencing hearing. Therefore, the trial court had before it sufficient evidence of appellant's identity, and this argument is without merit.

**{¶70}** Additionally and alternatively, we point out that on January 3, 2011, appellant filed a motion in limine to preclude testimony about his 1986 convictions if he chose to testify as they were too old to be probative. The court filed an entry denying his motion and stating that his prior convictions of kidnapping and aggravated robbery would be admissible if he testified. Thus, appellant essentially admitted to the court prior to trial that these prior convictions belonged to him.

**{¶71}** The next argument appellant makes here is that the court was not permitted to impose additional five-year concurrent sentences for the repeat violent offender specifications on counts six and seven, which the court had merged. Appellant is correct as the additional sentence can only be imposed on counts where the court imposed the longest term. *See* R.C. 2929.14(B)(2)(a)(iii); *State v. Peterson*, 8th Dist. No. 88248, 2007-Ohio-1837, ¶ 59 (sua sponte raising issue and remanding for correction of sentence).

**{¶72}** Here, the trial court only imposed five years for aggravated robbery, which had a maximum sentence of ten years, and the court only imposed five years for robbery, which had a maximum sentence of eight years. See R.C. 2911.01(A)(3), (C); R.C. 292911.01(A)(2), (B); R.C. 2929.14(A)(1)-(2). Thus, as the state concedes, the court was not permitted to impose additional sentences for those offenses. As such, the court's repeat violent offender sentence on these counts is reversed and the matter is remanded to delete the additional sentences for the repeat violent offender specifications on counts six and seven.

**{¶73}** On remand, the trial court is also instructed that when it merges counts, it can only enter a sentence on one of the merged counts. *See State v. Gardner*, 7th Dist. No. 10 MA 52, 2011-Ohio-2644, 2011 WL 2175814, ¶ 24, citing *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, at ¶ 17. When the court merged aggravated robbery and robbery at the state's request, only one of the offenses remained for sentencing.

**{¶74}** As this court and the Ohio Supreme Court have stated multiple times, two merged counts cannot both receive sentences, even concurrent sentences. This is said to constitute plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31 (plain error even where it is a jointly recommended sentence), citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 96–102. The remedy is to remand for a limited resentencing hearing so that the prosecution can select which of the merged offenses it wishes the court to proceed on for sentencing. *See Whitfield*, 124 Ohio St.3d 319 at ¶ 21–22 (finding that appellate court impermissibly intruded on the state's right to elect by ordering which offense to vacate); *Maumee v. Geiger*, 45 Ohio St.2d 238, 244, 344 N.E.2d 133 (1976).

**{¶75}** Appellant's final argument concerning *the remaining sentences* on the repeat violent offender specifications is that the trial court did not make sufficient findings to support its sentence. The additional prison terms were imposed under R.C. 2929.14(B)(2)(a), which provides that an additional term can be imposed only if all five listed criteria are met. The first three are not contested: (i) the offender was convicted of a repeat violent offender specification; (ii) the offense is a first degree felony of violence and life is not imposed; and (iii) the longest prison term was imposed. The controversy here involves the next two criteria:

> (iv) The court finds that the prison terms imposed * * * are inadequate to punish the offender and protect the public from future crime, because the applicable factors under section 2929.12 of the Revised Code indicating a greater likelihood of recidivism outweigh the applicable factors under that section indicating a lesser likelihood of recidivism.

> (v) The court finds that the prison terms imposed * * * are demeaning to the seriousness of the offense, because one or more of the factors under section 2929.12 of the Revised Code indicating that the offender's conduct is more serious than conduct normally constituting the offense are present, and they outweigh the applicable factors under

that section indicating that the offender's conduct is less serious than conduct normally constituting the offense.

R.C. 2929.14(B)(2)(a)(iv)-(v).

**{¶76}** The statute thereafter reiterates that when a court imposes an additional sentence on a repeat violent offender specification, "the court shall state its findings explaining the imposed sentence." R.C. 2929.14(B)(e). Appellant claims that the trial court violated these provisions by failing to make the required findings.

**{¶77}** However, subdivisions (iv) and (v), which were previously contained in (D)(2)(b)(i) and (ii), have been excised and severed from the statute by the Ohio Supreme Court. *See State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 74-78, 99. The Court concluded that from there on, judicial fact-finding was not required before imposing the additional penalty for a repeat violent offender specification. *Id.* at ¶ 99.

**{¶78}** In making it clear that a repeat violent offender specification still exists after *Foster*, the Court later restated that they eliminated the fact-finding requirements for repeat violent offender sentencing. *State v. Hunter*, 123 Ohio St.3d 164, 2009-Ohio-4147, 915 N.E.2d 292, ¶ 25-27, citing *State v. Mathis*, 109 Ohio St.3d 54, 846 N.E.2d 1, 2006-Ohio-855. Thus, the trial court need not make findings of fact before imposing penalty enhancements for repeat violent offenders. *Id.* at ¶ 26.

**{¶79}** The remainder of the *Hunter* holding addressed the defendant's argument that the court erred in considering relevant information about his prior conviction that was in the judicial record from the prior conviction. Id. at ¶ 28-29, 34-40. It does not provide support for appellant's argument here as he seems to suggest. Thus, the court did not err by failing to make the findings in R.C. 2929.14(B)(2)(a)(iv)-(v).

**{¶80}** As for division (B)(2)(e)'s requirement that the court state its findings explaining the additional sentence, this provision lacks substance after the required factual findings were deleted from the statute. *See State v. Bruce*, 8th Dist. No. 90897, 2009-Ohio-1067, ¶ 29 (holding that findings are not required under division (B)(2)(e) because *Foster* eliminated the court's obligation to make findings or give

reasons for imposing a sentence under an RVO specification). This conclusion is supported by precedent holding that "judicial fact-finding is no longer required in order for a court to * * * impose * * * penalty enhancements for repeat violent offenders * * *." *Mathis*, 109 Ohio St.3d 54 at ¶ 35.

**{¶81}** Finally, the trial court's entry stated that appellant was a repeat violent offender because he was previously convicted of aggravated robbery and kidnapping in Mahoning County Case Number 86CR151. And, as the state points out, the trial court stated that it considered the purposes and principles of sentencing under R.C. 2929.11 and balanced the seriousness and recidivism factors under R.C. 2929.12. (Tr. 14); Aug. 8, 2011 Sentencing Entry. For all of these reasons, appellant's argument (that mandatory findings were missing) is overruled. This assignment of error is sustained in part and overruled in part.

ASSIGNMENT OF ERROR NUMBER FOUR

**{¶82}** Appellant's fourth assignment of error contends:

**{¶83}** "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S REQUEST TO MERGE THE KIDNAPPING COUNTS WITH THE RAPE COUNTS IN THAT THEY WERE ALLIED OFFENSE OF SIMILAR IMPORT WITH NO SEPARATE ANIMUS."

**{¶84}** Where the same conduct by the defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. R.C. 2941.25(A). Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the defendant may be convicted of all of them. R.C. 2941.25(B).

**{¶85}** Under the old analysis for evaluating whether offenses were allied offenses of similar import or offenses of dissimilar import, the court was to compare the elements of the offenses in the abstract (without considering the defendant's conduct) to determine whether the elements corresponded to such a degree that the commission of one offense would result in the commission of the other offense.

*State v. Cabrales*, 118 Ohio St.3d 54, 2008-Ohio-1625, 886 N.E.2d 181, ¶ 14; *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999). If they were of dissimilar import, sentencing could proceed on both; if they were allied offenses of similar import, the court proceeded to look at the defendant's conduct to determine whether they were committed separately or with separate animus. *Cabrales*, 118 Ohio St.3d 54 at ¶ 14, 31; *State v. Jones*, 78 Ohio St.3d 12, 14, 676 N.E.2d 80 (1997).

{¶86} Now, however, courts are permitted to consider the defendant's conduct in determining whether the offenses are of similar import. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. All six justices that sat on *Johnson* agreed with the following syllabus law: "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. (*State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, overruled.)" *Johnson*, 128 Ohio St.3d 153 at syllabus. Besides this statement, *Johnson* did not provide us with any new legal precedent as there was no majority opinion. *See State v. Gardner*, 7th Dist. No. 10MA52, 2011-Ohio-2644, ¶ 23.

{¶87} Appellant argues that the two kidnapping counts should have been merged with the rape counts. The elements of rape are purposefully compelling sexual conduct by force or threat of force. R.C. 2907.02(A)(2). The elements of one of the kidnapping counts are using force, threat, or deception to remove another from the place where she is found or to restrain the liberty of another for the purpose of committing a felony or flight thereafter. R.C. 2905.01(A)(2). The elements of the other kidnapping count are the same except this count involves a purpose to engage in sexual activity against the victim's will. R.C. 2905.01(A)(4).

{¶88} Regarding the first step of the merger analysis, appellant urges that a forcible rape always entails a kidnapping, which the state does not contest. See *State v. Powell*, 49 Ohio St.3d 255, 262, 552 N.E.2d 191 (1990) (implicit in every forcible rape is a kidnapping; such offenses are allied offenses of similar import); *Gardner*, 7th Dist. No. 10MA52 at ¶ 30. Concerning the second step, appellant urges that movement from one room to another is not sufficient to constitute a separate act

of asportation in order to prove a separate animus for the kidnappings. Thus, we must determine whether the kidnappings were committed separately or with a separate animus from the rapes. As *Johnson* changed only the first step, the prior case law dealing with separate animus for kidnapping is still relevant. *Id.*

**{¶89}** Animus is defined as purpose or immediate motive. *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). When a kidnapping is committed during another crime, there exists no separate animus where the restraint or movement of the victim is merely incidental to the underlying crime. *State v. Fears*, 86 Ohio St.3d 329, 344, 715 N.E.2d 136 (1999), citing *Logan*, 60 Ohio St.2d 126. The kidnapping must have a significance independent of the rape. *State v. Craig*, 110 Ohio St.3d 306, 2006–Ohio–4571 853 N.E.2d 621, ¶ 117. "Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.* Moreover, where the restraint was prolonged, the confinement was secretive, or the movement was substantial, a separate animus exists. *State v. Lynch*, 98 Ohio St.3d 514, 2003–Ohio–2284, 787 N.E.2d 1185, ¶ 135; *Fears*, 86 Ohio St.3d at 344.

**{¶90}** The Supreme Court has used two polar extremes to illustrate these concepts. Where, for instance, the defendant's immediate motive was to engage in sexual intercourse and a "standstill" rape is committed, he may be convicted of either rape or kidnapping, but not both. *Logan*, 60 Ohio St.2d at 132. To the contrary, a defendant who restrains his rape victim for days prior to perpetrating the rape or who transports her across the state while intermittently raping her may have a separate animus as to kidnapping and rape allowing convictions on multiple counts. *Id.*

**{¶91}** In *Logan*, the Court found no separate animus for kidnapping where the defendant forced a victim into an alley and down a flight of stairs before raping her. *Id.* at 132. The Court said the movement had no significance except for facilitating the offense of rape and determined that it did not present a substantial increase in harm above that presented by the rape itself. *Id.* at 135.

**{¶92}** In *Adams*, the Court found no evidence of separate animus for kidnapping where the victim was not moved from her bedroom or restrained in any way other than what was necessary for the rape. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, ¶ 93. However, the victim was killed in *Adams,* and thus, there was no testimony as to the defendant's conduct.

**{¶93}** In *Rogers*, the Court found a separate animus for kidnapping where the defendant moved the victim from an outside stairway into his apartment and then to his bedroom. *State v. Rogers*, 17 Ohio St.3d 174, 181–182, 478 N.E.2d 984 (1985).

**{¶94}** Here, it can reasonably be found that appellant's conduct showed that he acted with a separate animus for the rapes than he possessed for the kidnappings. As for the kidnapping with purpose to engage in sexual activity with the victim against her will, the trial court rationally determined that this case does not fall at the merger end of the spectrum of rape cases. The defendant broke into the victim's house in the middle of the night and shook her awake. He covered her face with a bandana. He moved her from her bed, out of her bedroom, through the hallway, and into the dining room. He then grabbed her neck and threatened her life.

**{¶95}** Next, he moved her into the living room. He forced her onto the sofa and removed her clothing. He tried to perform vaginal sex and then forced her to perform oral sex on him. After bringing her back through the house to her bedroom and putting her in the closet in order to search for valuables, he then removed her from the closet and brought her into the hallway. Her got lotion from her closet. At this point, he vaginally and then anally raped her, thus intermittently raping her over the course of the encounter. Then, he moved her into the bathroom where he forced her to take a bath.

**{¶96}** All of this occurred while the victim's two-year-old child was sleeping in her bed (which, as he knew, acted as a restraint in itself). Thus, the restraint and removal could be seen as secretive as he acted against her while her child was sleeping thus ensuring her compliance without noise. Other signs of secret confinement, were his acts of covering her face and entering at 4:00 a.m.

{¶97} Moreover, it is notable that he spent some time voicing absurd statements to the victim as if to throw the police off his trail. For instance, he said his name was Mike. In addition, because he previously lived on the victim's street with his mother, he acted as though he did not know what street he was on and claimed that he meant to break into a house on the next street over (so it looked like he was unfamiliar with the area). He also told the victim that her child's father sent him. He then apologized and said that maybe he could be her boyfriend. These statements help establish that the restraint was longer than necessary to perform the rapes. The restraint was also shown to be prolonged as the victim estimated that appellant held her captive for an hour.

{¶98} Regarding the kidnapping with purpose to commit a felony or flight thereafter, appellant put the victim in a closet while he ransacked her apartment and stole money and jewelry. This was not merely incidental to a rape but was restraint with purpose to commit the felony of robbery. It was also for the purpose of committing another rape offense later by making sure she was confined where she could not see him while he emptied her drawers and purse.

{¶99} Furthermore, at the end of the invasion, appellant brought the victim into the bathroom, forced her to get in the bath that he had drawn, and then made her wash his evidence off of her body. This was not part of the rape. It was done to erase evidence and to keep her occupied so she would be delayed in calling the police. This was removal and restraint performed after the rape for the purpose of fleeing after a felony. Under all of the facts and circumstances here, we conclude that the trial court did not err in failing to merge the kidnappings with the rapes.

ASSIGNMENT OF ERROR NUMBER FIVE

{¶100} Appellant's fifth assignment of error argues:

{¶101} "APPELLANT WAS DENIED DUE PROCESS WHEN EVIDENCE OF APPELLANT'S INCARCERATION IN INDIANA WAS INTRODUCED, THUS ALLOWING APPELLANT EFFECTIVELY TO BE IMPEACHED WITH PRIOR CONVICTIONS WITHOUT TAKING THE STAND, AND PERMITTING THE JURORS TO CONVICT APPELLANT ON LESS THAN THE FULL COMPLEMENT OF

EVIDENCE REQUIRED FOR PROOF BEYOND A REASONABLE DOUBT UNDER [THE CONSTITUTION]."

{¶102} Appellant focuses on three remarks here. In opening statements, the prosecutor stated that there were no suspects until a DNA database turned up a profile in 2008, at which time the police went to Indiana to get DNA from appellant to confirm that he was a match. (Tr. 275). This is a statement about what the state's evidence would show at trial. It mentions nothing about jail. The reference to Indiana was made because that was where appellant lived in 2008. Thus, appellant's argument concerning this statement in opening has no merit.

{¶103} Appellant does not specifically argue this, but it seems he may be suggesting that the prosecutor's statement allowed the jury to wonder why appellant's DNA was in a database. However, the mere fact that a juror may deduce that the defendant had his DNA put into the database after a conviction, does not preclude the mention of the fact that an unknown suspect's DNA from a rape kit hit on a appellant's DNA profile years later initiating the collection of a fresh sample from appellant. *See State v. Garrett*, 1st Dist. No. C-090592, 2010-Ohio-5431, ¶ 26 (prosecutor can elicit that police received a hit on the CODIS database, noting that prosecutor did not suggest that the database contained DNA from convicts); *State v. Townsend*, 8th Dist. No. 87521, 2006-Ohio-5457, ¶ 64 (finding that reference to the CODIS database is permissible).

{¶104} In any event, appellant is using this statement only in conjunction with a portion of a police officer's testimony and a portion of the victim's testimony. After describing the evidence he collected in 2003, the police officer was asked what evidence he collected in 2008. The officer replied, "Two oral Integri swabs from Sammie Smith at the Putnam - -". As the court sustained the defense's objection, the officer never finished his thought. The state then asked if that was in Indiana. (Tr. 539).

{¶105} It seems the officer was going to say "at the Putnamville County Jail." However, the defense's objection stopped the testimony before any such indication of incarceration could be made to the jury. Appellant's own defense claim was that

he was in Indiana at the time of the offense. And, the jury heard testimony that appellant lived in Putnamville as a matter of background as this is where the police traveled when they interviewed appellant in 2008 and took his DNA sample. (Tr. 579). As such, the officer's uncompleted sentence referring to a town in Indiana was not prejudicial.

{¶106} Appellant's main argument here deals with a portion of the victim's testimony and whether a curative instruction eliminated any prejudice caused by that testimony. The state asked the victim what happened when the detectives contacted her in 2008, and the victim responded, "They said that he was in jail in Indiana and they got a DNA match and they came --" (Tr. 497). The defense objected and asked that the statement be stricken and the jury admonished. The court sustained the objection, informed the jury that the victim was not permitted to make that statement, and instructed the jury to disregard the statement. (Tr. 498).

{¶107} Appellant urges that the victim's disclosure tainted the jury because they would conclude that if he was in jail in 2008, he must be guilty of this crime because he is a criminal. He posits that the presumption of innocence was diluted by this revelation. He believes that the disclosure that he had been in jail was so inflammatory that the curative instruction was futile, citing *State v. Breedlove*, 26 Ohio St.3d 178, 271 N.E.2d 238 (1971). The state responds that the isolated comment was not overly prejudicial and that the jury is presumed to follow the court's curative instruction.

{¶108} In *Breedlove*, a witness testified that she picked the defendant out from photographs of "guys who had committed crimes." *Id.* at 180. The officer testified that he showed the witness police photographs of "possible suspects in armed robberies and burglaries." *Id.* The trial struck the quoted phrase and instructed the jury to disregard it. Another officer then testified that the photographs were generated from people who had outstanding warrants. *Id.* The photographs, which were obviously mug shots and which were labeled with police identifiers, were admitted into evidence.

{¶109} The Supreme Court stated that the police mug shot photographs with police identification numerals thereon, particularly when coupled with the above testimony, inappropriately suggested to the jury that appellant had prior trouble with the law. *Id.* at 183. The Court concluded that the curative instruction was not sufficient to overcome the substantial risk that, despite such instruction, the jury would look to the police photographs in determining the defendant's guilt of the offense at trial. *Id.* at 184. The Supreme Court reversed and remanded for a new trial.

{¶110} However, in a later case, a fellow inmate testified against the defendant, who was on trial for the aggravated murder of a correctional officer, and revealed that the defendant was in prison for murder. *State v. Zuern*, 32 Ohio St.3d 56, 59 512 N.E.2d 585 (1987). The defense objected, and the court instructed the jury that the remark was to be excluded from their consideration. *Id.*

{¶111} The Supreme Court noted that the state did not elicit the remark and that the witness was not connected with law enforcement. *Id.* The Court held that reversal is rarely required based on a presumption that a stricken revelation created bias as the defendant must demonstrate that the added information had a "probable shocking impact" on the jurors. *Id.* at 60 (finding little impact where the defendant was essentially only contesting whether the murder was aggravated or not).

{¶112} The Court then went through the voir dire answers where the jurors swore that they would judge the case on the evidence presented to them and would follow the trial court's instructions. *Id.* The Court noted that many trials occur in communities where the jurors are aware of some facts of the case or the defendant's background and that those jurors are not precluded from serving based on this knowledge if they follow their oaths. *Id.* The Court then alternatively ruled that any error was harmless because of the overwhelming evidence against the defendant. *Id.*

{¶113} Here, the answer was not provided by law enforcement but by the victim. And, the state did not attempt to elicit the victim's answer about appellant being in jail. (Tr. 497). Rather, the state was anticipating that she would answer the

question about what happened in 2008 by explaining that the detective showed her a photographic line-up.  (Tr. 498).

{¶114} Furthermore, the fact that a person was in "jail" five years after the offense is less prejudicial than a revelation that a person was in prison for murder at the time of the offense.  The mention of jail under all of the facts and circumstances here does not appear to have a "probable shocking impact" on the jurors, who swore to uphold the law and follow the court's instructions.  As stated previously, the fact that there was a DNA hit in 2008 was admissible even if it may have suggested to some jurors that appellant was in jail or prison.

{¶115} Plus, the court specifically instructed the jury to disregard the victim's statement and had already instructed them that if the court grants a motion to strike an answer, the jury must completely disregard it and not consider it for any purpose.  (Tr. 265, 498).   A jury is presumed to follow a trial court's instructions, and a defendant should object further if he is not satisfied with the court's curative instruction.  *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 39.  A jury is also presumed to follow their oath and to be capable of separating the impermissible considerations from the permissible.  *Zuern*, 32 Ohio St.3d at 60.

{¶116} Finally, there was overwhelming proof of appellant's guilt as his DNA matched the DNA found in the sperm sample from the victim's rape kit.   In conclusion, there is no right to an error-free or perfect trial.  *See id.*  Although it would have been preferable if the victim had not mentioned that appellant was in jail at the time of the DNA match, this information did not constitute reversible prejudice under the totality of the circumstances.  This assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SIX

{¶117} Appellant's sixth assignment of error contends:

{¶118} "APPELLANT WAS DENIED DUE PROCESS OF LAW AND A FAIR TRIAL BY REASON OF IMPROPER PROSECUTORIAL ARGUMENT."

{¶119} In closing argument, the state spoke about the core locations that matched in the DNA profiles and then stated that BCI "could have retested that, but so could the defendant."  Defense counsel objected.  The trial court overruled the

objection but instructed the jury that this was closing argument not evidence. (Tr. 627). Appellant now argues that the prosecutor's statement improperly shifted the burden to the defense. Appellant also states that the sample was lost so they could not retest it, making the state's closing argument even more prejudicial.

{¶120} Initially, we note that there is no evidence that the sample was lost as appellant claims on appeal. Appellant cites nothing in support of his claim on appeal that the sperm sample was lost. From our review, all we see is that the BCI analyst did not know she would be asked where the sample was at the moment, so she had not checked to ascertain its location before trial. Specifically, the BCI analyst testified that there is always part of the sample available later and that they are required to maintain half of it. (Tr. 383-384). She was asked if she knows where the sample is, and she responded that they recently starting returning evidence to the proper police department for storage so she was not sure if this particular case was still in her laboratory or had been returned. (Tr. 382-383).

{¶121} Regarding the prosecutor's comment itself, as the state points out, the comment that the defense did not retest the DNA occurred in the state's *rebuttal*. The defense had already opened the door to the state's comment in their closing argument *by stating twice that the BCI chose not to retest the samples.* (Tr. 615). Thus, the defense cannot now complain about a comment on a lack of retesting where they raised the failure to retest first. *State v. Peeples*, 7th Dist. No. 07MA212, 2009-Ohio-1198, ¶ 87 (defense counsel's statement that the prosecution failed to investigate the case and that telephone records should have been obtained opened the door to the prosecutor saying that the defense could have brought in phone records).

{¶122} In any case, the state can comment on the defense's failure to offer evidence in support of its case. *State v. Hale*, 119 Ohio St.3d 118, 147, 2008-Ohio-3426, 892 N.E.2d 864. Such comments do not implicitly shift the burden of proof to the defense. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 293 (where prosecutor asked, "Why didn't [the defense] present any witnesses?"), citing *State v. Collins*, 89 Ohio St.3d 524, 527-528, 733 N.E.2d 1118

(2000). *See also Peeples*, 7th Dist. No. 07MA212 at ¶ 88. For all of these reasons, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER SEVEN

{¶123} Appellant's seventh assignment of error alleges:

{¶124} "THE TRIAL COURT'S RULING PERMITTING APPELLANT TO BE IMPEACHED WITH PRIOR CONVICTIONS WAS AN ABUSE OF DISCRETION AND DENIED APPELLANT DUE PROCESS AND THE RIGHT TO DEFEND HIMSELF GUARANTEED BY [THE CONSTITUTION]."

{¶125} Evidence of a testifying defendant's prior conviction is generally not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release from parole imposed for that conviction, whichever is the later, *unless* the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. Evid.R. 609(B). Pursuant to this rule, appellant filed a motion in limine prior to trial asking the trial court to prohibit the state from impeaching him with evidence of his 1986 convictions if he decided to testify. He noted that he had been released from parole in May of 1998 and thus more than ten years had elapsed since his release from parole. The state urged that the convictions should be admitted as impeachment evidence if appellant chose to testify.

{¶126} The trial court overruled appellant's motion in a judgment entry, finding that the probative value of the prior convictions outweighs the danger of unfair prejudice. The court considered the nature of the crime, the age of the past conviction, the similarity between the offenses, the importance of the defendant's testimony, and the centrality of the credibility issue. The court also noted that it could not foresee the nature of appellant's testimony or his credibility on the stand. The court opined that the prior conviction involved a crime of dishonesty and that the charges then and now are similar.

{¶127} Thereafter, appellant did not testify at trial. Thus, the state did not present his prior convictions to impeach him.

**{¶128}** On appeal, appellant generally acknowledges that a motion in limine is a preliminary ruling which must be renewed at trial or the argument made therein is waived for purposes of appeal. *See, e.g., State v. Hill*, 75 Ohio St.3d 195, 202-203, 661 N.E.2d 1068 (1996) (the denial of a motion in limine does not preserve a claimed error for review in the absence of the defendant making a contemporaneous objection to the actual admission of the evidence at trial); *State v. Grubb*, 28 Ohio St.3d 199, 201-202, 503 N.E.2d 142 (1986) (a decision on a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of an evidentiary issue and is not a final determination as the trial court can change its mind at trial where the issue is presented in testimonial context).

**{¶129}** Appellant also specifically recognizes that prevailing law requires the defendant to testify in order to preserve a claim that the court improperly ruled that the state could present evidence impeaching the defendant's testimony. Appellant's argument here is that the prevailing law is "absurd," "unsound," and "nonsense" because his decision whether to testify hinged on the court's ruling on the motion in limine. The state agrees with appellant's recitation of the law and urges us to apply that law.

**{¶130}** The United States Supreme Court has held that a trial court's ruling on a motion in limine (permitting impeachment of a defendant by a prior conviction) is preserved and available for review *only if the defendant testifies at trial*. *Luce v. United States*, 469 U.S. 38, 43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Any harm flowing from the trial court's ruling on the motion in limine was found to be speculative, subject to change at trial, and unreviewable outside of its factual context. *Id.* at 41-42. The Court noted that requiring the defendant to testify despite an adverse decision on a motion in limine discourages defendants from making such motions solely to "plant" reversible error. *Id. See also Ohler v. U.S.*, 529 U.S. 753, 759-560, 120 S.Ct. 1851, 146 L.Ed.2d 826 (defendant whose motion in limine is denied and who then introduces own prior convictions on direct examination in attempt to lessen their effect, waives right to challenge trial court's ruling on motion in limine), citing *Luce*, 469 U.S. 38.

{¶131} The Ohio Supreme Court requires the contents of a motion in limine to be raised at trial in context in order for there to exist a trial court order subject to appeal. See, e.g., *Hill*, 75 Ohio St.3d at 202-203. Thus, a defendant is required to testify if he wishes to protest a court's preliminary ruling admitting prior convictions as impeachment evidence. *See, e.g., State v. Woods*, 8th Dist. No. 79674 (Feb. 28, 2002); *State v. Hanks*, 10th Dist. No. 99AP-1289 (Oct. 31, 2000); *State v. Costa*, 2d Dist. No. 98CA32 (Dec. 31, 1998); *State v. Elliott*, 4th Dist. No. 94CA836 (Feb. 27, 1995); *State v. Brown*, 9th Dist. No. 2091 (Sep. 16, 1992); *State v. Byrd*, 10th Dist. No. 81AP-384 (Dec. 10, 1981). *See also Jackson v. St. Elizabeth's Med. Ctr.*, 7th Dist. No. 97CA117 (Sep. 29, 1999) (once motion in limine is denied and prior conviction is ruled admissible, movant has strategic decision to make regarding whether to testify and admit their own prior conviction on direct examination, in which case they waive the ability to appeal the ruling, or wait and see if the other party will admit the prior conviction on cross-examination, in which case the ruling can be appealed later).

{¶132} As aforementioned, appellant admits that the state of the law in Ohio is not in his favor. There is no reason for this court to deviate from this position or to adopt a position that the United States Supreme Court's rationale in *Luce* is "nonsense" as appellant asks. Therefore, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER EIGHT

{¶133} Appellant's eighth assignment of error alleges:

{¶134} "APPELLANT'S CONVICTIONS AND SENTENCES ARE IN VIOLATION OF THE STATE AND FEDERAL CONSTITUTIONS BECAUSE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."

{¶135} Appellant sets forth two claims of ineffective assistance of counsel here, which were relocated to and disposed of by our analysis in assignments of error numbers one and two. Thus, we only briefly review the issues here as a refresher.

{¶136} First, defense counsel failed to object to the testimony of the Bode analyst introducing the DNA profile from the rape kit. Appellant states that if we find that this waived his ability to protest when the BCI analyst testified that she used

these rape kit results as a comparison for her analysis of appellant's sample, then counsel's failure to object during the Bode analyst's testimony constituted deficient performance which prejudiced his defense, since DNA was the pivotal evidence. Since it was concluded in assignment of error number one that the testimony from the Bode analyst was admissible and that the BCI analyst can make her comparisons in any event, this argument was found to be without merit.

{¶137} Second, appellant states that if we overrule his arguments regarding the timesheets only because he failed to object when the state introduced the evidence at the end of the case, then counsel rendered deficient performance that prejudiced his defense. As set forth in the second assignment of error, counsel took a moment off the record to consider whether he wished to object to the admission of the records and then came back and consented to their admission. This was a studied decision. In any event, assignment of error number two concludes that the witness was sufficiently qualified to introduce the payroll records. In accordance, this assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER NINE

{¶138} Appellant's ninth assignment of error provides:

{¶139} "THE TRIAL COURT DENIED APPELLANT DUE PROCESS UNDER THE FOURTEENTH AMENDMENT IN THAT HIS CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PROVIDED."

{¶140} Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*

{¶141} A reversal on weight of the evidence is ordered only in exceptional circumstances. *Id.* In fact, where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was against the manifest weight of the evidence. *Id.* at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution. The power of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses. *Id.*

{¶142} In conducting our review, we proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Rather, we defer to the jury who is best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, eye movements, and gestures of the witnesses testifying before it. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E. 1273 (1994); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 1212 (1967).

{¶143} Appellant's argument here focuses on his identity as the perpetrator of the offenses. Appellant states that there was no incriminating fingerprint evidence, the eyewitness could not make a positive identification of appellant, and the police did not provide voice exemplars to the victim. Appellant notes that the intruder identified himself as Mike and said that he was on the wrong street. Appellant believes the manner of entry was suspect and points to the intruder's claim that the child's father was behind the incident. Finally, appellant states that DNA was the pivotal evidence in the case and complains that the results were questionable as the analyst has discretion in clipping peaks when developing the DNA profile.

{¶144} None of this tips the scale so heavily in favor of appellant that this court would act to reverse the jury's conclusion that appellant was the perpetrator. It is not rare that the suspect's fingerprints are not discovered at a crime scene or are lifted but do not contain sufficient ridge detail for comparison. (Tr. 586-587). The eyewitness could not make a positive identification because she had a bandana over her face during all but a moment of the attack which happened five years prior.

Providing the victim with voice exemplars may or may not have been a good idea. In any event, their absence does not discredit the state's case.

{¶145} As for the weight to be given to the strange statements made by the rapist, there is absolutely no reason to believe that the rapist gave the victim his real name or that any of his statements were true. In fact, the rapist's statement that he was on the wrong street works against appellant because a reasonable juror could find that a neighbor may make such a statement to draw attention away from locals, and appellant previously lived on that street with his mother whom he often visited after moving to Indiana.

{¶146} The manner of entry was not suspect merely because glass in the pane was leaning toward the outside. The victim testified that the key was in the lock on the inside of the door when she went to bed and was on the outside of the door after the incident. Thus, it can reasonably be inferred that the intruder broke the glass toward the inside, took the key out of the lock, and then pulled the key (and his hand) back through the glass causing the remaining shards to move toward the outside, the direction his hand moved last.

{¶147} The jury heard the testimony concerning the DNA evidence from the rape kit. The experienced BCI analyst, who generated the profile of appellant's 2008 sample, testified to a reasonable degree of scientific certainty that appellant could not be excluded as the source of the sperm from the rape kit. (Tr. 378, 380). Defense counsel attempted to make an issue out of the clipping of peaks by the Bode analyst, but this was shown to be a standard procedure and was not shown to affect the typing of the core locations. Plus, the analyst's profile was repeated by another analyst who generated the same profile from the rape kit and was reviewed by her supervisor who assisted in some of the analysis.

{¶148} Also notable is the fact that the DNA at issue was from sperm rather than blood or saliva. Thus, there could have been no mix-ups with the female victim's DNA. Moreover, appellant was not a suspect until years after the DNA profile of the sperm sample was generated. That an analyst in Virginia would make a mistake resulting in the analyzer generating the DNA profile of appellant (someone

who happened to have previously lived on the same street as the victim) is a theory that a rational juror can assign little credit.

{¶149} For these reasons, the jury did not clearly lose its way and create a manifest miscarriage of justice as appellant contends. This assignment of error is overruled.

## CONCLUSION

{¶150} For the foregoing reasons, appellant's convictions are upheld. The additional five-year enhanced sentences for the repeat violent specifications on counts six and seven are reversed as they are unauthorized where the trial court did not impose a maximum sentence on either count. And, the five-year concurrent sentences on these merged counts are reversed and remanded for a limited resentencing hearing where the state can elect which offense it wishes the court to enter the five-year sentence on because two merged offenses cannot both receive sentences. The sentences on the other counts are upheld.

Donofrio, J., concurs.
DeGenaro, P.J., concurs.